## In re SPIELBERGER et al.

### No. 21419.

District Court, E. D. New York.

Oct. 10, 1933.

Joseph Dannenberg, of New York City (Julius M. Arnstein, of New York City, of counsel), for trustee.

Shaine & Weinrib, of New York City (Maurice L. Shaine, of New York City, of counsel), for bankrupt Harry Spielberger.

GALSTON, District Judge.

Harry Spielberger, one of the bankrupts, seeks to review an order of the referee which requires him to turn over to the trustee the books and records of the bankrupts used in their business prior to the filing of the petition in bankruptcy.

It is contended that the order should be reversed because it fails to appear from the proofs that Harry Spielberger, at the time of

the entry of the order, had possession of the books and records or that they were under his control.

The bankrupts were engaged in the manufacture of bows for shoes and slippers. Isidore Spielberger is the father of Harry Spielberger. They were associated in business for about twelve years, during the first six of which the enterprise was known as that of I. Spielberger, and during which time the son was employed by the father. Then the firm succeeded the individual business, and Harry Spielberger became a partner.

On November 6, 1931, Harry Spielberger executed and delivered to a committee of the New York Credit Men's Adjustment Bureau, Inc., a general assignment for the benefit of creditors. On December 7, 1931, an involuntary petition in bankruptcy was filed. On December 28, 1931, an order of adjudication was entered.

Harry Spielberger testified that his father had taken the books of account from the place of business of the bankrupts some time prior to the making of the general assignment. The testimony as to the time of the disappearance is far from satisfactory. It would not be otherwise important were it not that it affords one of the circumstances out of which an inference is sought to be drawn as to whether the books and records were taken by the father by arrangement with the son. At first Harry Spielberger testified that his father disappeared on or about September 15, 1931. At a subsequent hearing before the special commissioner under the 21–A examination, he changed the date to some time around the middle of October. This later date cannot be reconciled with the statement of the bankrupt that he had last seen the books on the Tuesday preceding the general assignment. That day would be November 3, 1931. So that if we assume the latter date to be the correct date of the disappearance of the books, and if the son saw the books for the last time when the father carried them away, then it must follow that the son saw the father as late as November 3, 1931.

■ Now it is contended that though Harry Spielberger was held out to the public as a partner, he was in point of fact not a partner, but received a salary and commissions. If this were true, it would have a bearing as to the power or control of the son over the possession or custody of the books. The contention is of little weight because there were so many things that happened in the conduct of the business which lead to a contrary view.

He had power to sign checks. It is true that he said that as to this power he was limited to $200 or $300 a week; but there is no evidence that notice of any such limitation was issued, for example, to the Bank of Manhattan. He kept the books, and not only prepared the financial statement filed with the National Credit Office, Inc., but signed it on March 4, 1931. So too, as has been stated above, it was he who executed the general assignment for the benefit of creditors. This was done in the absence of his father and without, as he contends, knowledge of his father's whereabouts.

One is driven to the conclusion that he was a partner with authority to act in all matters.

The certificate of the referee sets forth his unfavorable impression of the witness as to bearing and manner throughout the proceeding, as that "of one determined to pursue a policy of negation as long as possible, confident in the belief that if a final showdown was necessary, he could escape any disagreeable consequences by revelation of matters claimed to have been lately discovered."

This apparent reluctance to aid, the bankrupt explains on the ground that his relationship with his father was strained. His parents had been divorced some years before the filing of the petition in bankruptcy and he was not on visiting terms with his father. But whatever the social status may have been, the fact remains that they continued in business together.

It appears that during the months of September and October, merchandise in a considerable amount and of the value of approximately $20,000 was purchased. No adequate explanation is given of the alleged sales or disappearance of most of this merchandise. In the regular conduct of their business, invoices were received for goods purchased and sales memoranda made of all sales. Neither the invoices nor the sales memoranda were produced.

■ But the only question to be determined is: Were the books and records in the bankrupt's possession or control when the referee made the turnover order? In other words, was the bankrupt physically able to comply with the requirements of the order? See In re Goldman (C. C. A.) 62 F.(2d) 421; Coates v. Dresner (C. C. A.) 34 F.(2d) 264, 265.

In the latter case a turnover order for one of the books of a partnership was issued against both partners. One of the partners subsequently disappeared. In answer to the motion to punish for contempt made against

the other partner, he asserted that he was unable physically to obey the order. The Circuit Court of Appeals wrote:

"We think that, in a contempt proceeding against him alone, he should be heard to say, in explanation of his seeming disobedience, that, wholly without regard to past events, he has had neither possession of nor control over the book since the order was entered and therefore cannot alone obey it. * * *

"On the evidence in the case the original offense was joint and so, accordingly, was the order; and a contumacious violation of the order might also be joint; but one of the respondents acting alone might conceivably be rendered unable by the other to produce it alone and in that situation he should not be punished for what now he cannot do."

See, also, Southern Rock Island Plow Co. v. Florence (C. C. A.) 29 F.(2d) 397; Sinsheimer v. Simonson (C. C. A.) 107 F. 898.

In Oriel v. Russell, 278 U. S. 358, Chief Justice Taft said at page 362, 49 S. Ct. 173, 174, 73 L. Ed. 419: "We think a proceeding for a turnover order in bankruptcy is one the right to which should be supported by clear and convincing evidence. The charge upon which the order is asked is that the bankrupt, having possession of property which he knew should have been delivered by him to the trustees, refuses to comply with his obligation in this regard. It is a charge equivalent to one of fraud, and must be established by the same kind of evidence required in a case of fraud in a court of equity. A mere preponderance of evidence in such a case is not enough. The proceeding is one in which coercive methods by imprisonment are probable and are foreshadowed. The referee and the court in passing on the issue under such a turnover motion should therefore require clear evidence of the justice of such an order before it is made."

Accordingly, however unwilling one may be to accept the testimony of Harry Spielberger, nevertheless the fact remains that the father did disappear. He was not served with the bankruptcy process, and the trustee offered no proof of his whereabouts. The son may have been in error and may indeed have testified falsely as to when his father disappeared and as to when he saw the books last; but strain as one can, it seems unwarrantable to conclude that the bankrupt, Harry Spielberger, either had possession of the books and records or had them under control at the time of the entry of the turnover order.

In the absence of such proof, the foregoing authorities cited would seem to require a reversal of the order.

Settle order on notice.